J-A31036-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: S.C., C.C., AND J.C., MINORS | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.L., MOTHER | No. 918 MDA 2015 |

Appeal from the Orders Entered April 23, 2015
in the Court of Common Pleas of Mifflin County
Orphans' Court at Nos.: 28 of 2014
29 of 2014
30 of 2014

BEFORE: PANELLA, J., LAZARUS, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                 **FILED DECEMBER 23, 2015**

Appellant, J.L. (Mother), appeals the orders,[1] of the Court of Common

Pleas of Mifflin County, entered April 23, 2015, that terminated her parental

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Mother improperly filed only a single notice of appeal. The trial court issued three separate orders terminating Mother's parental rights. We find nothing in the record to indicate that these cases were formally consolidated. Nevertheless, Mother filed one notice of appeal in response to the three orders. Subsequent to Mother's notice of appeal, the trial court treated the appeals as if they had been consolidated. In fact, the trial court filed only a single opinion covering all three orders.

Our Supreme Court has stated, "taking one appeal from several judgments is not acceptable practice and is discouraged." **General Electric**
*(Footnote Continued Next Page)*

J-A31036-15

rights to her three daughters, S.C., C.C., and J.C. (Children). We affirm on the basis of the trial court opinion.[2]

This is the trial court's statement of the facts of this case:

> S.C. was born on April 29, 2003; C.C. was born on February 10, 2006; J.C. was born May 10, 2007. (Tr. Proceedings T.P.R. 113:23-25.) Mother signed a voluntary placement agreement on December 6, 2012. (Tr. Proceedings T.P.R. 115:9-12.) Their biological father, J.C., consented to voluntarily relinquish his parental rights to all three children on December 02, 2014. (Tr. Proceedings T.P.R. 4:11-13.) The Agency petitioned to confirm consent. The Court granted the Agency's petition to confirm consent and terminated Father's parental rights with orders dated March 23, 2015. Therefore, only Mother's parental rights were at issue during the March 23,

_(Footnote Continued)_ _____

**Credit Corp. v. Aetna Casualty and Surety Co.**, 263 A.2d 448, 451 (Pa. 1970).

We do not condone Mother's improper filing. Nevertheless, in the interest of judicial economy we decline to remand. This is a Children's Fast Track case. Our Internal Operating Procedures establish this Court's policy of deciding Children's Fast Track cases as expeditiously as possible. **See** I.O.P. § 65.14. We note that all three arise from the same facts and all three present the same questions for our determination. The trial court has filed a single opinion. In all likelihood, the same cases would eventually be presented to us, whether formally consolidated or separately appealed, at a later date. Therefore, remand would only delay the resolution of these appeals. Accordingly, even though the practice followed by Mother is generally discouraged, we will treat her appeal here on an exception basis as if the three notices of appeal had all been filed, or the cases were formally consolidated. We have amended the caption accordingly.

[2] The Children's father, J.C. (Father), consented to the termination of his parental rights by order entered in the trial court on March 24, 2015. The trial court terminated the parental rights of the Children's presumptive father on April 29, 2015. Neither Father nor the presumptive father filed appeals of those orders and neither is a party to this appeal.

- 2 -

2015 hearing. On December 17, 2014, the Agency[3] filed a petition to involuntarily terminate Mother's parental rights. Mother was served with the petition on January 20, 2015. (Tr. Proceedings T.P.R. 2:17-18.) The Agency has been working with Mother and her children since October 19, 2011, after receiving a referral[,] from the children's school[,] of sexual abuse. The Agency accepted the family for in-home services on December 7, 2011. (Tr. Proceedings T.P.R. 115:17-19.) These services included family based services, a mental health assessment for Mother at UCBH[4], child evaluations at Juniata River Center and drug and alcohol assessments for Mother and her husband, [Stepfather] (Tr. Proceedings T.P.R. 116:1-8.)

From this assessment, it was recommended that Mother attend individual therapy once a week for six to twelve months, in addition to medication management once a month for six to twelve months. (Tr. Proceedings T.P.R. 116:15-17.) On January 9, 2013, Mother attended her initial assessment for mental health services and was recommended for therapy and medication management. (Tr. Proceedings T.P.R. 119:6-11.) However, of the thirty-five (35) scheduled appointments, Mother attended twenty-four (24), cancelled five (5) and did not show for five (5) of the sessions. (Tr. Proceedings T.P.R. 119:17-18.) Due to inconsistent attendance, Mother's case was closed on September 24, 2014. (Tr. Proceedings T.P.R. 119:18-20.)

Mother and [Stepfather] participated in a psycho-sexual evaluation with Project Point of Light in June of 2013. (Tr. Proceedings T.P.R. 133:23-134:1.) The evaluation revealed that Mother had a sexual relationship with [Stepfather] when she was twelve (12) years of age and he was eighteen (18) years of age. (Tr. Proceedings T.P.R. 137:25-138:5.) Project Point of Light found that [Stepfather] would be a threat to the girls, both physically and sexually. (Tr. Proceedings T.P.R. 135:27-[2]8.) The evaluation also found that Mother did not have sufficient protective capacity to ensure the safety of the girls. (Tr. Proceedings T.P.R. 135:15-20.) As such, Project Point of Light also found that Mother would not be an appropriate supervisor.

_____

[3] Mifflin County Children and Youth Social Services Agency (Agency).

[4] Universal Community Behavioral Health.

(Exhibit P1.) Mother was given the opportunity to have a reassessment at Project Point of Light, but her file was closed when Mother advised she would not continue with the reassessment. (Tr. Proceedings T.P.R. 135:9-14.)

A case was opened with Family Intervention Crisis Services (hereinafter "FICS") for reunification services on July 8, 2013. (Tr. Proceedings T.P.R. 78:7-8.) At the time FICS conducted its intake assessment, it noted many concerns. FICS was concerned with Mother's lack of protective capacity and parental supervision, her unresolved grief, and her history of mental and behavioral issues. FICS was sensitive to the children's sexually inappropriate behavior, as an uncle in Ohio had been identified as a sexual predator to one of the children. (Tr. Proceedings T.P.R. 80:24-81:1.) In order to prevent inappropriate sexual behavior among the girls, FICS thought it appropriate the children have separate sleeping arrangements. (Tr. Proceedings T.P.R. 80:10-13.) All three children reported to FICS that Mother knew about the sexual behavior the children were engaging in, and that they were disciplined for this behavior. (Tr. Proceedings T.P.R. 79:25-80:2.) The children's school also affirmed that Mother was aware of this activity. (Tr. Proceedings T.P.R. 79:22-25.) However, Mother denied knowing that there was any sexually inappropriate behavior among the children. (Tr. Proceedings T.P.R. 79:17-19.) Rather, Mother claims she learned of this behavior after placement. (Tr. Proceedings T.P.R. 153:6-12.) Mother also denies S.C.'s sexual abuse, alleging S.C. was touched over her panties, which is simply not consistent with the record. (Tr. Proceedings T.P.R. 14:15-20.) FICS found that Mother would spend a lot of [time] minimizing and denying past occurrences. (Tr. Proceedings T.P.R. 84:13-15.) Mother would ignore difficult situations, hoping that they would just go away. (Tr. Proceedings T.P.R. 84:21-22.)

Domestic violence between Mother and [Stepfather] was also reported by the girls. (Tr. Proceedings T.P.R. 13:12-15.) However, Mother denied and minimized this. (Tr. Proceedings T.P.R. 13:12-15.) The children reported seeing their Mother beaten up on numerous occasions, but Mother insists this never happened. Rather than validating her children's fears and concerns, Mother told the children that she only fought with [Stepfather] one time, and it was her fault. (Tr. Proceedings T.P.R. 13:22-24.) However, the record shows that Mother filed a Petition for Protection From Abuse against [Stepfather] on July

31, 2014. (Exhibit P4.) In the petition, she alleges [Stepfather] attacked her, threatened to stab her cat, stabbed a knife into a cabinet, pushed her down, jumped on top of her and further references [Stepfather's] illicit drug use. (Exhibit P4.) In this petition, Mother unequivocally asserted, "I'm scared for my children." (Exhibit P4.) Furthermore, she references past abuse by [Stepfather]. (Exhibit P4.) At the time of filing the petition, Mother admitted to understanding the children's fear of [Stepfather]. (Tr. Proceedings T.P.R. 97:12 -0:2.) However, on September 10, 2014, Mother filed a Petition for Modification of the Protection from Abuse Order and petitioned that the "order be dropped," as Mother did not believe in divorce and wanted to work out her problems with [Stepfather]. (Exhibit P6.) Mother now minimizes and negates [Stepfather's] domestic abuse. (Tr. Proceedings T.P.R. 13:25 -14:2.)

FICS provided numerous services to Mother in light of their concerns. FICS offered bi-weekly to weekly visitations with the children and extensive parenting orientations. (Tr. Proceedings T.P.R. 82:10.) The parent education and counseling sessions focused on Mother's protective capacity, effective communication, reflective listening, validating the children's feelings, and placing the children's needs first. (Tr. Proceedings T.P.R. 82:15-81:24.) Mother's use of these services was overall inconsistent. (Tr. Proceedings T.P.R. 98:18.) Mother refused to attend counseling, alleging that the grief support program was not beneficial to her. (Tr. Proceedings T.P.R. 142:18-24.) Mother was also resistant and defensive to any feedback provided by FICS. (Tr. Proceedings T.P.R. 98:19-22.) Mother was not willing to discuss how to increase her protective capacity, how to meet her children's needs, how to validate her children's feelings and how to make decisions based on her children's needs rather than her own needs. (Tr. Proceedings T.P.R. 100:18-22.) Mother did not understand her children's feelings and emotions. (Tr. Proceedings T.P.R. 100:22-23.) Mother, at times, was willing to look at herself to develop a deeper insight, but it was always negated by denial and blame. (Tr. Proceedings T.P.R. 92:10-16.) As such, FICS' overall assessment was that Mother's sessions were unproductive. (Tr. Proceedings T.P.R. 84:7) At the end of September 2014, Mother advised FICS that she would no longer participate in their services, except for visits with the girls. (Tr. Proceedings T.P.R. 98:6 -9.)

As of November 2014, Mother attended forty-one (41) out of forty-three (43) visits. FICS' assessment of these visits, however, was that Mother's affect was flat and emotionless. (Tr. Proceedings T.P.R. 100:21-22.) Mother struggled to manage her emotions during visitations and struggled to place the girls' needs above her own. (Tr. Proceedings T.P.R. 100:18 -19.) The girls expressed a fear of [Stepfather]; Mother refused to accept this. (Tr. Proceedings T.P.R. 101:1-10.) In May of 2014, Mother went to a visit with a large mouth-sized imprint on her neck, which led to a reaction by the girls, who believed [Stepfather] had hurt their mother again. (Tr. Proceedings T.P.R. 102:1-4.) Mother's response was that the girls had seen "hickies" before and therefore did not believe the girls were afraid. (Tr. Proceedings T.P.R. 102:9 -14.) Mother also failed to take notice of J.C. self-stimulating herself while sitting on Mother's lap. (Tr. Proceedings T.P.R. 102:8-9.) When given feedback by FICS on these matters, Mother negated the feedback as lies and discounted the girls' fears and emotions. (Tr. Proceedings T.P.R. 102:18-22.)

The Agency made a referral to Psychologist David G. Ray to conduct a psychological evaluation on Mother and [Stepfather] to assess their psychological functioning and parental capacity as well as the bond Mother has with S.C., C.C., and J.C. Mr. David G. Ray testified regarding his psychological evaluation of Mother and his observation of her with the children, based on his report dated September 18, 2014. In evaluating Mother, Mr. Ray conducted three clinical interviews with her and administered a battery of tests and questionnaires. (Tr. Proceedings T.P.R. 8: 18-20.) He also interviewed S.C., C.C., and J.C. on June 17, 2014 and observed two supervised visits between Mother and the three children on June 10, 2014 and June 17, 2014. (Exhibit P1.) Mr. Ray also observed the children with their foster parents. (Tr. Proceedings T.P.R. 9: 11-14.) Based on the interviews and Mother's history, he concluded that Mother has several diagnoses, including Post-Traumatic Stress Disorder, Mood Disorder NOS and Personality Disorder NOS, Mixed Personality Disorder, with a history of Depression and Bipolar Disorder. (Tr. Proceedings T.P.R. 19:7-18.) It was his opinion that Mother displays a decided lack of empathy and has a high need to be needed. (Tr. Proceedings T.P.R. 42:8-10.) He further opined that Mother's wants and needs tend to come first. (Exhibit P4.) Mother's coping style is to deny and to

project and rationalize blame. (Tr. Proceedings T.P.R. 11: 10-11.)

Mr. Ray testified that Mother lacks insight into the multiple horrific traumas that the children have experienced. (Tr. Proceedings T.P.R. 11:12-16.) Mother fails to comprehend how her behavior and actions affect her children. (Tr. Proceedings T.P.R. 11: 17 -19.) In turn, Mother lacks the capacity to parent her children and is unable to afford an environment that will provide for the health, welfare and safety of the children. Mother feels like she is the victim and refuses to take responsibility for her actions. (Tr. Proceedings T.P.R. 12: 18-20.) The children have multiple traumas and the oldest suffers from sexual trauma, yet Mother denies and minimizes this. (Tr. Proceedings T.P.R. 13:8-10.)

An evaluation of [Stepfather] reveals, like Mother, he sees himself as a victim and takes absolutely no responsibility for his actions, by minimizing and diminishing blame. (Tr. Proceedings T.P.R. 20:11-20.) Mr. Ray testified that he has grave concerns about [Stepfather]. (Tr. Proceedings T.P.R. 20: 11-12.) He described [Stepfather] as an extremely self-centered individual who exhibits manipulative and narcissistic traits and an underdeveloped conscience. (Tr. Proceedings T.P.R. 20:20-23.) Mr. Ray concurred with Project Point of Light's opinion that [Stepfather] should not be around the children. (Tr. Proceedings T.P.R. 25:19-21.)

Mr. Ray opined that S.C., C.C. and J.C. have extreme serious mental health problems that are exacerbated by the uncertainty in their life. (Exhibit P1.) As such, Mr. Ray stressed that there is a strong need for permanency for these girls. (Tr. Proceedings T.P.R. 31: 23-31:1.) According to Mr. Ray, S.C. is a hurting, angry young lady who does not like men. (Tr. Proceedings T.P.R. 29:2-4.) At a young age, S.C. was molested by an uncle and her sister. (Tr. Proceedings T.P.R. 29:22-24.) S.C. was also present during the tragic house fire that resulted in the death of her sister. (Tr. Proceedings T.P.R. 30:2-3.) Shortly thereafter, her parents divorced and S.C. has since watched her Mother repeatedly beaten by [Stepfather]. (Tr. Proceedings T.P.R.30:9-11.) These events have manifested into complex trauma, which, under Mother's care, had not been dealt with. (Tr. Proceedings T.P.R. 30 :18-19.) A psychological evaluation revealed that S.C. harbors a relatively large number

of problematic thoughts, feelings and behaviors. (Exhibit P4.) S.C. has been diagnosed, by her therapist, with Post-Traumatic Stress Disorder, Oppositional/Defiant Disorder and Learning Disability. (Tr. Proceedings T.P.R. 29:20-22.) As a result of the diagnoses, Mr. Ray emphasized S.C.'s need for proper parenting and structure. (Exhibit P1.) He held that the biggest issue holding S.C. back from healing is a sense of permanency. (Tr. Proceedings T.P.R. 30:24-31:1.) He opined that, S.C. is in need of a warm, loving, safe environment, where she is validated. (Tr. Proceedings T.P.R. 32:22-24.) Mother has refused to validate S.C.'s trauma. (Exhibit P1.)

Like S.C., C.C.'s therapist diagnosed C.C. with Post-Traumatic Stress Disorder with complex trauma. (Exhibit P1.) Mr. Ray described C.C. as a talkative young child who lacks boundaries. (Tr. Proceedings T.P.R. 33:12-13.) C.C. talked at length with Mr. Ray about seeing her Mother and [Stepfather] watch porn and have sexual relations. (Tr. Proceedings T.P.R. 33:24-34:1.) C.C. further reported seeing her Mother beaten and choked. (Tr. Proceedings T.P.R. 32:9-11.) She told Mr. Ray that she watched [Stepfather] choke her Mother and then have sexual relations with her. (Tr. Proceedings T.P.R. 34:2-3.) When asked what C.C. enjoyed about her visits with Mother, C.C. responded that she liked the food. (Tr. Proceedings T.P.R. 34:15-19.) Mr. Ray testified that C.C. needs an environment where she can continue to heal, to feel safe and secure and feel validated. (Tr. Proceedings T.P.R. 35:14-18.)

J.C. suffers from Complex Trauma and Reactive Attachment Disorder. (Tr. Proceedings T.P.R. 37:8-9.) J.C. reported that she does not feel safe at Mother's home. (Tr. Proceedings T.P.R. 36:11-15.) Testimony provided that J.C. has peed herself, prior to visits with her Mother. (Tr. Proceedings T.P.R. 34:19-21.) J.C. also confirms being exposed to heterosexual and homosexual pornography in Mother's home. (Tr. Proceedings T.P.R. 37:3-4.) While J.C. acted out sexually, prior to her placement, this behavior has decreased. (Tr. Proceedings T.P.R. 37:23-25.) According to Mr. Ray, in order to thrive, J.C. needs a warm, secure, safe, loving and structured home. (Tr. Proceedings T.P.R. 38:10-13.) It was Mr. Ray's opinion that all three girls have suffered serious psychological trauma and appear to have significant delays which are now being remediated in terms of their educational and overall knowledge. (Exhibit P1.)

At the time the children were placed in foster care, there were delays in terms of age appropriate behaviors as well as serious disinhibition and dysregulation of behavior. (Tr. Proceedings T.P.R. 15:17-22.) Since being placed in a foster home, which Mr. Ray described as warm, loving and secure, the girls have markedly changed, for the better. (Exhibit P1.) Mr. Ray observed the [girls'] behaviors with their foster parents and found that the girls were calm and relaxed. (Tr. Proceedings T.P.R. 40:24-41:1.) Mr. Ray opined that each of the girls have developed a healthy, secure attachment with their foster parents. (Tr. Proceedings T.P.R. 47:23-25.) He believes that this will set the stage for healing to begin. (Tr. Proceedings T.P.R. 48:10-15.)

(Trial Court Opinion, 4/23/15, at 1-8).

The trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A §§ 2511(a)(2), (5), (8) and (b), by orders entered April 23, 2015. Mother timely filed her notice of appeal and statement of errors complained of on appeal on May 21, 2015.

Mother raises the following two questions on appeal:

1. Did the trial court err in ordering involuntary termination of Mother's parental rights under 23 Pa.C.S. §2511(a)(2), (a)(5) and (a)(8) when there was a lack of clear, convincing, and sufficient evidence in support of those grounds for termination?

2. Did the trial court err in ordering involuntary termination of Mother's parental rights under 23 Pa.C.S. §2511(b) as serving each child's needs and welfare, when there was a lack of clear, convincing and sufficient evidence that the severing of the mother/child bond was in each child's best interest?

(Mother's Brief, at 6).

Our standard and scope of review are well-settled:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence

- 9 -

presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we have stated:

Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

In this case, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), and (b). In order to affirm the termination of parental rights, this Court need only agree with any one subsection of Section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004).

Requests to have a natural parent's parental rights terminated are governed by 23 Pa.C.S.A. § 2511, which provides, in pertinent part:

## § 2511. Grounds for involuntary termination

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

&#42; &#42; &#42;

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

&#42; &#42; &#42;

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

&#42; &#42; &#42;

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

&#42; &#42; &#42;

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing,

furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

It is well settled that a party seeking termination of a parent's rights bears the burden of proving the grounds to so do by "clear and convincing evidence," a standard which requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re T.F.***, 847 A.2d 738, 742 (Pa. Super. 2004) (citations omitted). Further,

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

***In the Interest of K.Z.S.***, 946 A.2d 753, 759 (Pa. Super. 2008) (citations omitted).

The fundamental test in termination of parental rights under Section 2511(a)(2) was long ago stated in the case of ***In re Geiger***, 459 Pa. 636, 331 A.2d 172 (1975). There the Pennsylvania Supreme Court announced that under what is now Section 2511(a)(2), that the petitioner for involuntary termination must prove "[t]he repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to

- 12 -

be without essential parental care, control, or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent." *Id.*, at 173.

The Adoption Act provides that a trial court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). The Act does not make specific reference to an evaluation of the bond between parent and child but our case law requires the evaluation of any such bond. *See In re E.M.*, 533 Pa. 115, 620 A.2d 481 (1993). However, this Court has held that the trial court is not required by statute or precedent to order a formal bonding evaluation performed by an expert. *In re K.K.R.-S*., 958 A.2d 529, 533 (Pa. Super. 2008).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the trial court, we conclude that there is no merit to the issues Mother has raised on appeal. The trial court opinion properly disposes of the questions presented. (*See* Trial Court Opinion, filed 4/23/15, at 9-14) (concluding that: (1) Agency established by clear and convincing evidence that sufficient grounds for involuntary termination of Mother's parental rights existed under 23 Pa.C.S.A. §§ 2511(a)(2), (a)(5) and (a)(8); and that (2) clear, convincing and sufficient evidence existed under 23 Pa.C.S.A. § 2511(b) that terminating

Mother's parental rights would best serve each Child's developmental, physical and emotional needs). Accordingly, we affirm on the basis of the trial court's opinion.

Orders affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/23/2015

IN THE COURT OF COMMON PLEAS OF MIFFLIN COUNTY, PENNSYLVANIA

ORPHAN'S COURT DIVISION

| | | |
|---|---|---|
| In the Interest of: S.C. | : | PARENTAL ACTION NO. 28 of 2014 |
| | : | |
| In the Interest of: C.C. | : | PARENTAL ACTION NO. 29 of 2014 |
| | : | |
| In the Interest of: J.C. | : | PARENTAL ACTION NO. 30 of 2014 |

*Distributed 4/23/15 /MS*

Patricia A. Gardner, Esquire
20 North Wayne Street
Lewistown, PA 17044
*Counsel for Mifflin County Children*
*& Youth Social Services*

Michael S. Gingerich, Esquire
Rear 27 North Brown Street
Lewistown, PA 17044
*Counsel for Mother*

Stuart A. Cilo, Esq.
29 West Third Street
Lewistown, PA 17044
*Guardian ad litem*

## OPINION

Barron, David, W.,[1] April 23rd 2015 – Mifflin County Children and Youth Social Services ("the Agency" hereafter) filed a petition to terminate the parental rights of the natural mother, J.L. ("Mother" hereafter), with respect to her three children, S.C., C.C., and J.C. A termination hearing was held March 24, 2015. This opinion is in support of the Court's Order, entered same date, terminating Mother's parental rights.

### FACTUAL AND PROCEDURAL HISTORY

S.C. was born on April 29, 2003; C.C. was born on February 10, 2006; J.C. was born May 10, 2007. (Tr. Proceedings T.P.R. 113:23-25.) Mother signed a voluntary placement agreement on December 6, 2012. (Tr. Proceedings T.P.R. 115:9-12.) Their biological father, J.C., consented to voluntarily relinquish his parental rights to all three children on December 02, 2014. (Tr. Proceedings

---

[1] Assisted by Alina M. Jolly., Judicial Law Clerk.

1

T.P.R. 4:11-13.) The Agency petitioned to confirm consent. The Court granted the Agency's petition to confirm consent and terminated Father's parental rights with orders dated March 23, 2015. Therefore, only Mother's parental rights were at issue during the March 23, 2015 hearing. On December 17, 2014, the Agency filed a petition to involuntarily terminate Mother's parental rights. Mother was served with the petition on January 20, 2015 (Tr. Proceedings T.P.R. 2:17-18.)

The Agency has been working with Mother and her children since October 19, 2011, after receiving a referral from the children's school of sexual abuse. The Agency accepted the family for in-home services on December 7, 2011. (Tr. Proceedings T.P.R. 115:17-19.) These services included family based services, a mental health assessment for Mother at UCBH, child evaluations at Juniata River Center and drug and alcohol assessments for Mother and her husband, Lane. (Tr. Proceedings T.P.R. 116:1-8.)

From this assessment, it was recommended that Mother attend individual therapy once a week for six to twelve months, in addition to medication management once a month for six to twelve months. (Tr. Proceedings T.P.R. 116:15-17.) On January 9, 2013, Mother attended her initial assessment for mental health services and was recommended for therapy and medication management. (Tr. Proceedings T.P.R. 119:6-11.) However, of the thirty-five (35) scheduled appointments, Mother attended twenty-four (24), cancelled five (5) and did not show for five (5) of the sessions. (Tr. Proceedings T.P.R. 119:17-18.) Due to inconsistent attendance, Mother's case was closed on September 24, 2014. (Tr. Proceedings T.P.R. 119:18-20.)

Mother and Lane participated in a psycho-sexual evaluation with Project Point of Light in June of 2013. (Tr. Proceedings T.P.R. 133:23-134:1.) The evaluation revealed that Mother had a sexual relationship with Lane when she was twelve (12) years of age and he was eighteen (18) years of age. (Tr. Proceedings T.P.R. 137:25-138:5.) Project Point of Light found that Lane would be a threat to the girls,

2

13

both physically and sexually. (Tr. Proceedings T.P.R. 135:27-8.) The evaluation also found that Mother did not have sufficient protective capacity to ensure the safety of the girls. (Tr. Proceedings T.P.R. 135:15-20.) As such, Project Point of Light also found that Mother would not be an appropriate supervisor. (Exhibit P1.) Mother was given the opportunity to have a reassessment at Project Point of Light, but her file was closed when Mother advised she would not continue with the reassessment. (Tr. Proceedings T.P.R. 135:9-14.)

A case was opened with Family Intervention Crisis Services (hereinafter "FICS") for reunification services on July 8, 2013. (Tr. Proceedings T.P.R. 78:7-8.) At the time FICS conducted its intake assessment, it noted many concerns. FICS was concerned with Mother's lack of protective capacity and parental supervision, her unresolved grief, and her history of mental and behavioral issues. FICS was sensitive to the children's sexually inappropriate behavior, as an uncle in Ohio had been identified as a sexual predator to one of the children. (Tr. Proceedings T.P.R. 80:24-81:1.) In order to prevent inappropriate sexual behavior among the girls, FICS thought it appropriate the children have separate sleeping arrangements. (Tr. Proceedings T.P.R. 80:10-13.) All three children reported to FICS that Mother knew about the sexual behavior the children were engaging in, and that they were disciplined for this behavior (Tr. Proceedings T.P.R. 79:25-80:2.) The children's school also affirmed that Mother was aware of this activity. (Tr. Proceedings T.P.R. 79:22-25.) However, Mother denied knowing that there was any sexually inappropriate behavior among the children. (Tr. Proceedings T.P.R. 79:17-19.) Rather, Mother claims she learned of this behavior after placement. (Tr. Proceedings T.P.R. 153:6-12.) Mother also denies S.C.'s sexual abuse, alleging S.C. was touched over her panties, which is simply not consistent with the record. (Tr. Proceedings T.P.R. 14:15-20.) FICS found that Mother would spend a lot of minimizing and denying past occurrences. (Tr. Proceedings T.P.R. 84:13-15.) Mother would ignore difficult situations, hoping that they would just go away. (Tr. Proceedings T.P.R. 84:21-22.)

Domestic violence between Mother and Lane was also reported by the girls. (Tr. Proceedings T.P.R. 13:12-15.) However, Mother denied and minimized this. (Tr. Proceedings T.P.R. 13:12-15.) The children reported seeing their Mother beaten up on numerous occasions, but Mother insists this never happened. Rather than validating her children's fears and concerns, Mother told the children that she only fought with Lane one time, and it was her fault. (Tr. Proceedings T.P.R. 13:22-24.) However, the record shows that Mother filed a Petition for Protection From Abuse against Lane on July 31, 2014. (Exhibit P4.) In the petition, she alleges Lane attacked her, threatened to stab her cat, stabbed a knife into a cabinet, pushed her down, jumped on top of her and further references Lane's illicit drug use. (Exhibit P4.) In this petition, Mother unequivocally asserted, "I'm scared for my children." (Exhibit P4.) Furthermore, she references past abuse by Lane. (Exhibit P4.) At the time of filing the petition, Mother admitted to understanding the children's fear of Lane. (Tr. Proceedings T.P.R. 97:12-0:2.) However, on September 10, 2014, Mother filed a Petition for Modification of the Protection from Abuse Order and petitioned that the "order be dropped," as Mother did not believe in divorce and wanted to work out her problems with Lane. (Exhibit P6.) Mother now minimizes and negates Lane's domestic abuse. (Tr. Proceedings T.P.R. 13:25-14:2.)

FICS provided numerous services to Mother in light of their concerns. FICS offered bi-weekly to weekly visitations with the children and extensive parenting orientations. (Tr. Proceedings T.P.R. 82:10.) The parent education and counseling sessions focused on Mother's protective capacity, effective communication, reflective listening, validating the children's feelings, and placing the children's needs first. (Tr. Proceedings T.P.R. 82:15-81:24.) Mother's use of these services was overall inconsistent. (Tr. Proceedings T.P.R. 98:18.) Mother refused to attend counseling, alleging that the grief support program was not beneficial to her. (Tr. Proceedings T.P.R. 142:18-24.) Mother was also resistant and defensive to any feedback provided by FICS. (Tr. Proceedings T.P.R. 98:19-22.) Mother was not willing to discuss

4

how to increase her protective capacity, how to meet her children's needs, how to validate her children's feelings and how to make decisions based on her children's' needs rather than her own needs. (Tr. Proceedings T.P.R. 100:18-22.) Mother did not understand her children's' feelings and emotions. (Tr. Proceedings T.P.R. 100:22-23.) Mother, at times, was willing to look at herself to develop a deeper insight, but it was always negated by denial and blame. (Tr. Proceedings T.P.R. 92:10-16.) As such, FICS' overall assessment was that Mother's sessions were unproductive. (Tr. Proceedings T.P.R. 84:7) At the end of September 2014, Mother advised FICS that she would no longer participate in their services, except for visits with the girls. (Tr. Proceedings T.P.R. 98:6-9.)

As of November 2014, Mother attended forty-one (41) out of forty-three (43) visits. FICS' assessment of these visits, however, was that Mother's affect was flat and emotionless. (Tr. Proceedings T.P.R. 100:21-22.) Mother struggled to manage her emotions during visitations and struggled to place the girls' needs above her own. (Tr. Proceedings T.P.R. 100:18-19.) The girls expressed a fear of Lane, Mother refused to accept this. (Tr. Proceedings T.P.R. 101:1-10.) In May of 2014, Mother went to a visit with a large mouth sized imprint on her neck, which led to a reaction by the girls, who believed Lane had hurt their Mother again. (Tr. Proceedings T.P.R. 102:1-4.) Mother's response was that the girls had seen "hickies" before and therefore did not believe the girls were afraid. (Tr. Proceedings T.P.R. 102:9-14.) Mother also failed to take notice of J.C. self-stimulating herself while sitting on Mother's lap. (Tr. Proceedings T.P.R. 102:8-9.) When given feedback by FICS on these matters, Mother negated the feedback as lies and discounted the girls' fears and emotions. (Tr. Proceedings T.P.R. 102:18-22.)

The Agency made a referral to Psychologist David G. Ray to conduct a psychological evaluation on Mother and Lane to assess their psychological functioning and parental capacity as well as the bond Mother has with S.C., C.C., and J.C. Mr. David G. Ray testified regarding his psychological evaluation of Mother and his observation of her with the children, based on his report dated September 18, 2014. In

5

evaluating Mother, Mr. Ray conducted three clinical interviews with her and administered a battery of tests and questionnaires. (Tr. Proceedings T.P.R. 8: 18-20.) He also interviewed S.C., C.C., and J.C. on June 17, 2014 and observed two supervised visits between Mother and the three children on June 10, 2014 and June 17, 2014. (Exhibit P1.) Mr. Ray also observed the children with their foster parents. (Tr. Proceedings T.P.R. 9: 11-14.) Based on the interviews and Mother's history, he concluded that Mother has several diagnoses, including Post-Traumatic Stress Disorder, Mood Disorder NOS and Personality Disorder NOS, Mixed Personality Disorder, with a history of Depression and Bipolar Disorder. (Tr. Proceedings T.P.R. 19:7-18.) It was his opinion, that Mother displays a decided lack of empathy and has a high need to be needed. (Tr. Proceedings T.P.R. 42:8-10.) He further opined that Mother's wants and needs tend to come first. (Exhibit P4.) Mother's coping style is to deny and to project and rationalize blame. (Tr. Proceedings T.P.R. 11: 10-11.)

Mr. Ray testified that Mother lacks insight into the multiple horrific traumas that the children have experienced. (Tr. Proceedings T.P.R. 11:12-16.) Mother fails to comprehend how her behavior and actions affect her children. (Tr. Proceedings T.P.R. 11: 17-19.) In turn, Mother lacks the capacity to parent her children and is unable to afford an environment that will provide for the health, welfare and safety of the children. Mother feels like she is the victim and refuses to take responsibility for her actions. (Tr. Proceedings T.P.R. 12: 18-20.) The children have multiple traumas and the oldest suffers from sexual trauma, yet Mother denies and minimizes this. (Tr. Proceedings T.P.R. 13:8-10.)

An evaluation of Lane reveals, like Mother, he sees himself as a victim and takes absolutely no responsibility for his actions, by minimizing and diminishing blame. (Tr. Proceedings T.P.R. 20:11-20.) Mr. Ray testified that he has grave concerns about the children's step-father. (Tr. Proceedings T.P.R. 20: 11-12.) He described Lane as an extremely self-centered individual who exhibits manipulative and narcissistic traits and an underdeveloped conscience. (Tr. Proceedings T.P.R. 20:20-23.) Mr. Ray

6

17

concurred with Project Point of Light's opinion that Lane should not be around the children. (Tr. Proceedings T.P.R. 25:19-21.)

Mr. Ray opined that S.C., C.C. and J.C. have extreme serious mental health problems that are exasperated by the uncertainty in their life. (Exhibit P1.) As such, Mr. Ray stressed that there is a strong need for permanency for these girls. (Tr. Proceedings T.P.R. 31: 23-31:1.) According to Mr. Ray, S.C. is a hurting, angry young lady who does not like men. (Tr. Proceedings T.P.R. 29:2-4.) At a young age, S.C. was molested by an uncle and her sister. (Tr. Proceedings T.P.R. 29:22-24.) S.C. was also present during the tragic house fire that resulted in the death of her sister. (Tr. Proceedings T.P.R. 30:2-3.) Shortly thereafter, her parents divorced and C.C. has since watched her Mother repeatedly beaten by Lane. (Tr. Proceedings T.P.R.30:9-11.) These events have manifested into complex trauma, which, under Mother's care, had not been dealt with. (Tr. Proceedings T.P.R. 30:18-19.) A psychological evaluation revealed that S.C. harbors a relatively large number of problematic thoughts, feelings and behaviors. (Exhibit P4.) S.C. has been diagnosed, by her therapist, with Post-Traumatic Stress Disorder, Oppositional/Defiant Disorder and Learning Disability. (Tr. Proceedings T.P.R. 29:20-22.) As a result of the diagnoses, Mr. Ray emphasized S.C.'s need for proper parenting and structure. (Exhibit P1.) He held that the biggest issue holding S.C. back from healing is a sense of permanency. (Tr. Proceedings T.P.R. 30:24-31:1.) He opined that, S.C. is in need of a warm, loving, safe environment, where she is validated. (Tr. Proceedings T.P.R. 32:22-24.) Mother has refused to validate S.C.'s trauma. (Exhibit P1.)

Like S.C., C.C.'s therapist diagnosed C.C. with Post-Traumatic Stress Disorder with complex trauma. (Exhibit P1.) Mr. Ray described C.C. as a talkative young child who lacks boundaries. (Tr. Proceedings T.P.R. 33:12-13.) C.C. talked at length with Mr. Ray about seeing her Mother and Lane watch porn and have sexual relations. (Tr. Proceedings T.P.R. 33:24-34:1.) C.C further reported seeing her Mother beaten and choked. (Tr. Proceedings T.P.R. 32:9-11.) She told Mr. Ray that she watched

7

Lane choke her Mother and then have sexual relations with her. (Tr. Proceedings T.P.R. 34:2-3.) When asked what C.C. enjoyed about her visits with Mother, C.C. responded that she liked the food. (Tr. Proceedings T.P.R. 34:15-19.) Mr. Ray testified that C.C. needs an environment where she can continue to heal, to feel safe and secure and feel validated. (Tr. Proceedings T.P.R. 35:14-18.)

J.C. suffers from Complex Trauma and Reactive Attachment Disorder. (Tr. Proceedings T.P.R. 37:8-9.) J.C. reported that she does not feel safe at Mother's home. (Tr. Proceedings T.P.R. 36:11-15.) Testimony provided that J.C. has peed herself, prior to visits with her Mother. (Tr. Proceedings T.P.R. 34:19-21.) J.C. also confirms being exposed to heterosexual and homosexual pornography in Mother's home. (Tr. Proceedings T.P.R. 37:3-4.) While J.C. acted out sexually, prior to her placement, this behavior has decreased. (Tr. Proceedings T.P.R. 37:23-25.) According to Mr. Ray, in order to thrive, J.C. needs a warm, secure, safe, loving and structured home. (Tr. Proceedings T.P.R. 38:10-13.) It was Mr. Ray's opinion that all three girls have suffered serious psychological trauma and appear to have significant delays which are now being remediated in terms of their educational and overall knowledge. (Exhibit P1.)

At the time the children were placed in foster care, there were delays in terms of age appropriate behaviors as well as serious disinhibition and dysregulation of behavior. (Tr. Proceedings T.P.R. 15:17-22.) Since being placed in a foster home, which Mr. Ray described as warm, loving and secure, the girls have markedly changed, for the better. (Exhibit P1.) Mr. Ray observed the girls behaviors with their foster parents and found that the girls were calm and relaxed. (Tr. Proceedings T.P.R. 40:24-41:1.) Mr. Ray opined that each of the girls have developed a healthy, secure attachment with their foster parents. (Tr. Proceedings T.P.R. 47:23-25.) He believes that this will set the stage for healing to begin. (Tr. Proceedings T.P.R. 48:10-15.)

8

*19*

# DISCUSSION

The court must undergo a two-step analysis when deciding whether to terminate an individual's parental rights. First, the court must determine whether the petitioner proved with clear and convincing evidence one of the grounds for termination stated in 23 Pa.C.S.A. § 2511(a). Next, the court must assess the children's developmental, physical, and emotional needs and welfare in accordance with 23 Pa.C.S.A. § 2511(b) and the best interests of the child standard. The court must consider each case's individual circumstances and the parent's explanations to determine whether the "totality of the circumstances" justifies terminating the parent's rights. *In re B.N.M.,* 856 A.2d 847, 853 (Pa. Super. 2004).

In its petition for involuntary termination of parental rights, the Agency alleges grounds for termination under 23 Pa.C.S.A. § 2511(a)(2), 23 Pa.C.S.A. § 2511(a)(5) and 23 Pa.C.S.A. § 2511(a)(8). The Court will first address the termination grounds found in all three alleged sections. Then it will separately determine whether terminating Mother's parental rights serves the children's best interests.

I.      **Termination Grounds**

**A. Termination Pursuant to 23 Pa.C.S.A. § 2511(a)(2)**

Section 2511(a)(2) authorizes the court to terminate a parent's rights if:

> "The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent."

23 Pa. C.S.A. § 2511(a)(2).

Here, the Agency by clear and convincing evidence established the termination grounds found in § 2511(a)(2), relative to Mother. As stated above, Mother was not motivated to attend counseling sessions as recommended by FICS, or to cooperate with any of their recommendations. The children's fears and concerns desperately need to be validated. The children need an environment that is safe and secure

9

where they can continue to heal from the complex trauma they have suffered. Mother is oblivious to the extensive needs of her children and is unable to provide an environment that provides for the children's health, welfare and safety. All three girls have reported that they do not feel safe at Mother's home. Mother's own testimony provided that should the children return to her home, the possibility of them being physically abused by Lane will always be there. This is not a risk the Court is willing to take.

Despite numerous services offered to Mother, she has refused assistance. The record indicates that Mother's decided lack of empathy and her inability to comprehend how her behavior and actions affect her children, make Mother incapable of fulfilling her role as a competent parent. Mother continues to deny and minimize the domestic abuse in the home. She also continues to deny that the children were ever exposed to porn in the home. Mother has had two years to correct her behaviors, and she has chosen to continue in her incapacity and neglect of the children. Mother has played games with CYS and admittedly tells them what they want to hear. For this reason, Mr. Ray testified that there are no services that could be provided to Mother that would enable her to remedy her incapacity.

The court does not need to wait until a more convenient time for the parent to become involved. In re E.M., 908 A.2d 297, 304 (Pa. Super. 2007)(stating that "parental rights are not preserved" by waiting for a more "convenient" or "suitable" time for the parent while others perform their duties). Accordingly, the Court finds grounds to terminate Mother's parental rights pursuant to § 2511(a)(2).

**B.    Termination Pursuant to 23 Pa.C.S.A. § 2511(a)(5)**

Section 2511(a)(5) permits the court to terminate parental rights when:

> "The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child

within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child."

23 Pa.C.S.A. § 2511(a)(5).

The Agency by clear and convincing evidence also established the termination grounds found in § 2511(a)(5), relative to Mother. At the time of the hearing, the children had been in foster care for approximately twenty-seven months. Mother made minimal to no progress towards her parenting objectives between the time that S.C., C.C., and J.C. were found dependent in December 2012 and the time the Agency petitioned for the termination of her parental rights in December 2014. Mother testified that she decided not to attend counseling because the audience was not similar to her, yet failed to seek out any other counseling groups. While Mother appeared willing to listen at times, she never followed through or changed her behaviors. Mother's own testimony provided that the conditions have remained the same in her household. Gravely, Mother testified that she often told FICS what they wanted to hear. Mother was defensive and resistant to any services or feedback provided by FICS, and testified that she would not do any of the offered services. Both Project Point of Light and FICS terminated services for Mother because of her decision to not complete the programs and counseling offered to her.

As such, the Court finds Mother has not and will not remedy the conditions which led to the removal and placement of her children. The children need an environment that is safe and secure where they can continue to heal from the complex trauma they have suffered. Mr. Ray's assessment of Mother indicates that Mother will never be able to be a competent parent because she is not able to create a sense of stability and security for her children. Despite the services offered to Mother, she reverts to a victim mentality and puts her needs above the needs of her children. As Mother did not remedy her parental capacity or her behaviors that led to the neglect of the children and their placement in foster care, the Court finds grounds to terminate Mother's parental rights pursuant to § 2511(a)(5).

11



### C. Termination Pursuant to 23 Pa.C.S.A. § 2511(a)(8)

The court may terminate a parent's parental rights under § 2511(a)(8) if:

> "The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, twelve months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would serve the needs and welfare of the child."

23 Pa.C.S.A. § 2511(a)(8).

The Agency by clear and convincing evidence also established the termination grounds found in § 2511(a)(8), relative to Mother. As noted above, at the time of the hearing, the children had been in foster care for approximately twenty-seven months Again, Mother's lack of empathy, her inability to place the needs of her children above her own needs, her poor decision making and her failure to meet the parenting objectives, over the span of two years, proves to the Court that the conditions which led to the children's removal continues to exist. Mother admits there is a potential for abuse if the children were allowed to return home. Yet, in light of numerous reports by the children of domestic and sexual abuse in the home, Mother continues to deny and minimize these occurrences. She is oblivious to the extensive needs of her children. Rather than fix her behaviors, Mother has played a game with CYS, telling them what she thinks they want to hear. It is apparent to the Court that Mother has chosen to continue in her incapacity and neglect of the children and terminating her parental rights would best serve the needs and welfare of S.C., C.C. and J.C. who are happy, healthy, and well-adjusted in their foster home. As such, the court finds grounds to terminate Mother's parental rights pursuant to §2511(a)(8).

### II. The Children's Best Interests

Having found the Agency established with clear and convincing evidence the termination grounds stated in §§ 2511(a)(1), 2511(a)(5) and 2511(a)8), the Court must determine whether terminating Mother's parental rights serves the children's best interests. As mentioned, the court must give "primary

determination" to the child's "developmental, physical, and emotional needs." 23 Pa.C.S.A. § 2511(b). This analysis involves an examination of "intangibles such as love, comfort, security, and stability." *In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006). The court must assess the bond the children have with the parents and whether termination would sever "existing, necessary, and beneficial relationship[s]." In re K.Z.S., 946 A.2d 753, 760 (Pa. Super. 2008)(citing In re. *C.S.*, 761 A.2d 1197, 1202 (Pa. Super. 2000). The court must pay "close attention" to the effect severing the bond with the parent has on the children. *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). However, the children's needs and welfare are the most important factors. *In re K.Z.S.*, 946 A.2d at 760.

In this case, the Agency established terminating Mother's parental rights serves the children's best interests. Mr. Ray found that all three children have an insecure disorganized attachment to Mother and these attachments are not beneficial to them. All three girls reported that they did not feel safe in Mother's home. Mr. Ray determined that the fear of returning to Mother is causing the children significant emotional harm and dysregulation of behavior. Therefore, he opined that the children's needs and welfare would best be served by severing the children's relationship with mother and moving towards adoption. The children need permanency in their lives. While Mr. Ray anticipates that the termination of parental rights will cause some psychological trauma for the children, the long term effects of permanency far outweigh the effects of terminating Mother's parental rights. The Court finds that severing an insecure bond that is having a current negative impact on the children is in their best interests. The trauma described by Mr. Ray may or may not develop and, from the Court's view, does not warrant the continued existence of the present negative attachment to Mother.

The Court acknowledges that Mother has attended most of the visits with her children and that Mother loves and cares about the children, but S.C., C.C., and J.C. would be deprived of a permanent, healthy, safe, and secure parent/child relationship if Mother's rights were maintained. It is clear from the

13

*24*

testimony of Mr. Ray that the children feel safe and secure with their foster parents, and the children have developed a positive attachment to them. Therefore, the Court finds terminating Mother's parental rights serves the children's developmental, physical, and emotional needs and welfare.

## CONCLUSION

This Court finds the Agency met its burden, relative to Mother, by proving through clear and convincing evidence the grounds for involuntary termination of parental rights found in 23 Pa.C.S.A. §§2511(a)(2), 2511(a)(5), and 2511(a)(8). Further, terminating Mother's parental rights is clearly in the best interests of S.C., C.C., and J.C.

BY THE COURT:

DAVID W. BARRON
PRESIDENT JUDGE